**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**ELKINS**

**STACEY NICHOLE POLING,**

Plaintiff**,**

**v.**                                                        **CIVIL ACTION NO.: 2:16-CV-22**
                                                            **(JUDGE BAILEY)**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**[1]

Defendant.

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On March 29, 2016, Plaintiff Stacey Nichole Poling ("Plaintiff"), by counsel Brian

Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of

Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or

"Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. §

405(g). (Compl., ECF No. 1).  On June 7, 2016, the Commissioner, by counsel Helen Campbell

Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the

proceedings.  (Answer, ECF No. 8; Admin. R., ECF No. 9). On June 21, 2016, and July 20,

2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.

(Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 11; Def.'s Mot. for Summ. J. ("Def.'s Mot."),

ECF No. 13).  Following review of the motions by the parties and the administrative record, the

undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

---

[1] After this suit was filed, but before this Order was entered, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule 25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

## II. **PROCEDURAL HISTORY**

On April 18, 2012, Plaintiff protectively filed her first application under Title XVI of the Social Security Act for supplemental security income ("SSI") alleging disability that began on July 31, 2011. (R. 169-180). This claim was initially denied on July 5, 2012 (R. 69) and denied again upon reconsideration on December 14, 2012 (R. 82). On March 22, 2013, Plaintiff filed a written request for a hearing (R. 111), which was held before United States Administrative Law Judge ("ALJ") Karen Kostol on September 22, 2014 in Morgantown, West Virginia. (R. 40). Plaintiff, represented by counsel Brian Bailey, Esq., appeared and testified, as did Larry Ostrowski, an impartial vocational expert. (Id.). On November 18, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 15). On February 3, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

Because the ALJ's decision was based on a number of evident misunderstandings, mischaracterizations, and omissions of the evidence of record, her decision rests on a legally insufficient foundation and cannot be sustained. The undersigned accordingly finds that the Commissioner's decision is not supported by substantial evidence, as explained fully below, and recommends that the decision be vacated and the case remanded to the Commissioner for further proceedings.

## III. **BACKGROUND**

### A. **Personal History**

Plaintiff was born on February 22, 1993 (R. 169), and was nineteen (19) years old at the time she filed her first SSI claim (eighteen at the date of onset alleged). (R. 69.). She completed High School (R. 46). Plaintiff had previously tried to work part time at the Children's Place, but

was unable to sustain that part time employment due to her conditions. (R. 47). The ALJ determined that Plaintiff had "no past work" for the purpose of considering Plaintiff's claim. (R. 48). Plaintiff has never been married and has no dependent children. (R. 169). Plaintiff alleges disability based on full-body arthritis, endometriosis, severe migraines, irritable bowel, both shoulders out of socket, anxiety, depression, hypertension in spinal column, possible ADHD, and chronic cervicitis. (R. 69).

## B.     Medical History

### 1.  Medical History Pre-Dating Alleged Onset Date of July 31, 2011

Plaintiff was referred to Dr. Harman on November 24, 2010 for "very severe [pelvic] pain – misses school." (R. 290). Subsequent treatment notes identify complaints of "being exhausted, mood swings, feels sad, depressed." (R. 293). Plaintiff also complained of acne, nausea, chest tenderness and difficulty breathing, and stated it was difficult to speak. Id. On December 20, 2010, Plaintiff underwent a laparoscopic surgery to treat endometrial implant at Monongalia General Hospital. (R. 282).

### 2.  Medical History Post-Dating Alleged Onset Date of July 31, 2011

Plaintiff reported numerous times to the Emergency Room of Mon General for treatment of severe migraine headaches, including on October 13, 2011 (R. 308), November 18, 2011 (R. 303), and January 29, 2012 (R. 301). During her migraines, Plaintiff complained of photophobia (light sensitivity), nausea, and sensitivity to sound, in addition to blurry vision. Id. Light and noise made her migraines worse, and nothing made them better. Id.  She also reported having hit her forehead "twice in the last 4 days." (R. 308). Pain was rated between 6 and 8 out of 10. Id. A CT scan on October 13, 2011 was unremarkable. (R. 314).  Plaintiff subsequently went to Regional Eye Associates for evaluation of "possible ocular migraine." (R. 346).

On October 20, 2011, she began seeing Dr. Felix Brizuela, neurologist, for her migraines:

> Although she's been having bad headaches occasionally for quite some time, or the last 4 weeks she's been having severe frequent headaches. Occurring almost on a daily basis. The headaches are accompanied by her blurriness of her vision in both eyes. The blurriness comes and goes, and proceeds and headaches. [She] also has fogginess with the headache disappeared she feels like she is drunk. She also gets lightheaded and dizzy. The headache can last all day. The associated symptoms come and go and they tend to be short lived although frequent.

(R. 331). An MRI of her spine on October 22, 2011 was unremarkable. (R. 334). A lab test for rheumatoid arthritis was negative. (R. 337).

On February 24, 2012, Plaintiff was given Botox injections, and Dr. Brizuela noted that her "headaches [were] about the same," with a frequency of about 3-4 times per week and a pain level of 8 on a scale of 1-10. (R. 329). Upon examination that day, which was largely normal, Plaintiff was "in moderate distress," and was a "little tearful during the [injection] procedure." Though he wrote that she "tolerated the procedure well," she was also in enough distress that Dr. Brizuela did not give Plaintiff the full number of injections. Id. On March 20, 2012, Dr. Felix Brizuela, treating neurologist, noted Plaintiff was having 5-6 migraines per week, accompanied by nausea, vomiting, and photophobia. (R. 327). She reported that her migraines are not as intense when she takes Nucynta, which was three times per day at that point. Id. Dr. Brizuela noted that the finding of drusen at her opthamology evaluation are highly unlikely to be related to her migraines. Id. As to the culprit, he opined:

> I would have to include based on my experience that this is due to her endometriosis. This is the exact scenario I see with young woman with an endometrial and chronic migraines. They tend to respond to very little to nothing including Botox and end up on her chronic opioid therapy and now with advent of Nucynta, and opioid agonist This healed and she has responded to, so I would conclude that this Is pretty much we can offer her at this time. She had asked us she may benefit from scraping of endometrial tissue, and my response was entered.
> Small fiber sensory neuropathy-she tested negative for connective tissue disease in the past. However, her arthritis is interesting and we should rule out other things we did not test for such as sarcoidosis and Sjogren syndrome.

Polyarthritis with chronic cervicalgia. I do feel that a cervical spondylosis is contributing to her headaches.

(R. 328).

After an abnormal pap smear on August 3, 2012, Plaintiff was referred to Dr. Thomas Harman for a colposcopy. (R. 729). On August 28, 2012, results indicated normal appearance and no obvious lesions on the cervix, however, the assessment noted "can not exclude high grade lesion," and noted a positive test for human papilloma virus (HPV). (R. 729). Impression was "normal cervix," no biopsy was taken, and Plaintiff was to follow up in six months. Id. Plaintiff returned on March 11, 2013 complaining of irregular periods, endometriosis, dyspareunia, and significant pain ("very intense, passes out"). (R. 731). Plaintiff was prescribed Hydrocodone-Acetominophen for dyspareunia, and a laparoscopy and hysteroscopy were to be scheduled. (R. 732).

Plaintiff underwent surgical (laparoscopic) lysis of adhesions, excision of endometriosis, uterosacral nerve ablation, hysteroscopy, and dilation & curettage on April 4, 2013. (R. 734). The procedures had resolved her pain and she appeared in no acute distress at this followup. Id. However, she returned again on May 8, 2013, after having to go to the Emergency Room when her pain returned on May 4 – 5, 2013. (R. 736). She was started on Oxycodone-Acetaminophen for endometriosis. Id. By March 18, 2014, Dr. Harman noted that her abdominal pain "improved after each laparoscopy," but apparently eventually returned after each as well. (R. 759). He prescribed Zofran in addition to Balziva, noting "if this doesn't work, will plan repeat laparoscopy, could also consider Lupron," and wanted a follow-up in two months. (R. 759).

On April 4, 2014, Plaintiff saw John McKnight, M.D. for evaluation pursuant to a referral from Dr. Brizuela based on tachycardia and near syncope. (R. 751). Dr. McKnight conducted an EKG and assessed unexplained sinus tachycardia with near syncope. (R. 752). He placed

Plaintiff on a 30-day event monitor and planned a followup "in a couple of months" after they had more data to make a definitive plan. Id. Results from the monitor by Dr. Linton-Frazier, M.D. showed "bouts of sinus tachycardia with a maximum heart rate of 170 beats/minutes," accompanied by shortness of breath, lightheadedness and dizz[iness]." (R 764).

Plaintiff underwent intake screening for treatment at Community Mental Health Center for depression and Anxiety with therapist Emily Sarkees on April 28, 2014. She reported "suffer[ing] depressive symptoms since she was a young child," and began experiencing feelings of anxiety in second grade after her house burned to the ground. (R. 721). Plaintiff reported self-harm in the form of cutting and suicidal ideation – "with plan, but no means or attempts" - "towards the end of high school," during which period two of her friends had passed away. Id. She reported having seen a therapist during that time, and their sessions "focused mostly on bereavement," which helped her anxiety "a bit," but not her depression. Id. Before that therapist could address depression and do ADHD screenings, she was unable to continue in treatment for insurance reasons. Id. She denied any cutting behavior or suicidal ideation recently. Id.

Sarkees described Plaintiff as "very receptive to therapy and acknowledges the good it did for her in the past," and "taking all steps possible to get back to a more functional life." (R. 723). Plaintiff had "mild dysfunction in domains 3 & 4." Id. Sarkees noted that Plaintiff met the "criteria for moderate major depressive disorder; however, due to the complexity of what is going on with her much more exploration is needed." Id. Diagnoses included Major depressive disorder – moderate, recurrent; and "limited social life due to illness" in addition to her medical problems. Id. Plaintiff returned for additional treatment on May 21, 2014. (R. 724). Notes from that session explained in more detail the bases of Plaintiff's anxiety and depression, as well as her history:

> This 21 y.o. Caucasian female presents today for evaluation of mood swings and severe anxiety. Her neurologist recommend [sic] she see someone for tx with mood stabilizers and to get therapy. Patient has anxiety and depression since she was 7 y.o. which is when their house burned to the ground on Thanksgiving evening. She had such severe anxiety that she vomited nearly every day and missed an entire year of school after that. She has a lot of physical health problems. She has been unable to work and/or finish college as a result. She feels she is a burden to her parents since her treatments are so expensive. She has made a lot of physical progress, but mentally, she's getting worse. She may go 3 days without sleep, racing thoughts, anger, agitation. She will then drop to a rock bottom depression and may sustain that for a month at a time. She has spent a lot of days in bed up to 48 hours at a time. She takes 3-8 hours to get to sleep-at night. Thoughts race. She gets passive suicidal thoughts once q [sic] 2 months. She has never been hospitalized for mental health reasons. Never been on medications other than Nortriptyline for sleep and was prescribed Zoloft as a child, but father refused to give it to her for fear she would become suicidal.

(R. 724-725). A mental status examination on May 21, 2014 by PA-C Lesa Feather revealed normal findings, except that Plaintiff's mood was depressed and her affect was constricted. (R. 725). Plaintiff was prescribed Depakote for her mood swings; once stabilized, her treatment plan then included starting an SSRI [selective serotonin reuptake inhibitor] for anxiety and panic, and discontinuing Nortriptyline. (R. 727-28).

At a followup visit with Dr. Brizuela on June 13, 2014, he narrated:

> Her neuropathy status quo, not having a great amount of pain her balance and walking is good. I spoke to her mother, as well as her brother, whom I got permission from Stacey did talk to, and they both claimed that she's been Incredible since he's been on the IVIG. Her headaches however have not improved at all with the Botox. Still gets a fair amount headaches. Recalled that she has fairly bad endometriosis. She is going for a surgical procedure this week for her endometriosis, although it Is not a hysterectomy. She is having headaches approximately 3 times a week, throbbing pulsating type, associated with nausea vomiting and photophobia. . . Some flashing lights with the headaches Positive nausea and vomiting. . .

(R. 742). His impressions included 1) chronic inflammatory demyelinating polyneuropathy – stable with IVIG, and 2) chronic migraine headaches – "in [his] opinion, her endometriosis is [a] major precipitating factor." (R. 743). As to his treatment plan, Dr. Brizuela noted that "all [he] can do for [] and about the headaches is to continue to perhaps try things to try to alleviate the

pain. [G]oing to give her a trial of Zanaflex 4 mg twice a day for the myofascial component to see if this helps." Id.

Rheumatologist Colleen Watkins, M.D., with the WVU Department of Orthopaedics evaluated Plaintiff on June 30, 2014 for rheumatoid arthritis due to joint pain. (R. 744). Her narrative outlined relevant history and medical information:

> I evaluated your patient today for the possibility of rheumatoid arthritis due to her joint pain. The patient and her mother who gives some of the history today tell me that she is a 21-year-old female who has had chronic pain at least for the past 6 years. All of her joints are painful, achey [sic] and stiff. She has joint pain all over and her body hurts. Most of the pain is in her hips, knees, neck and hand, always severe and it never stops. She does not have prolonged morning stiffness or joint swelling which she terms is a fibromyalgia or bruising pain is in her arms, chest and thighs. At times she cannot stand clothes to touch her. She has difficulty standing, sitting or walking, she has to change positions all day. She cannot walk, stand or sit for periods of time. She has to go lay down because of pain and fatigue. She has shin aches and pain due to her neuropathy that is severe. Bending over hurts her and gives her back and hip pain. Squatting is painful because of her knees and her hips. Lifting, pushing and pulling are painful at times and almost impossible. She has joint problems in her shoulders and her shoulders dislocate often. Her feet and her hands fall asleep easily. She has a weak feeling in her muscles. Her hands will cramp and hurt really bad when performing tasks such as writing, typing and trying to open jars. She has back pain which affects her from standing, sitting and lying. Her sleeping pattern, she goes from one extreme to the other, either she cannot sleep at all or she can sleep for hours or she can sleep for 18-20 hours at a time. She has slept for 24 hours at one time, got up to use the bathroom and went back. to bed. She is tired all the time every day of the year. Her eyes are sensitive to the sun, bright lights, electronic screens. She has bumps on her hands and her feet, wrists and elbows, they are hard knots. They are getting more and more painful. They hurt her when she writes. Her hands are shaky all the time, some days are worse than others. She also has accompanying irritable bowel, endometriosis can incapacitate her until the pain stops. Confusion, she forgets words, she is dizzy all the time and has extreme exhaustion. In addition, she has nausea for which she takes to Zofran, depression, anxiety, panic attacks, moody and angry. Her legs and hands will jerk or go up out of place for no reason. She has a rapid heart rate. Migraine headaches are severe. She has tried multiple medications for those at least 12 medications including Botox injections. She has bad times when she went to go to the bathroom and ended up on the floor unable to get up with sweating, cramps, nausea and vomiting and times where she cannot breathe and she has problems with concentration.

(R. 744). Upon physical examination, Dr. Watkins confirmed that Plaintiff "does have small knots over her left third and fourth MCPs only," which "do not appear to be rheumatoid

nodules." (R. 769). She also had 18 out of 18 fibromyalgia tender points. Id. Dr. Watkins noted that Plaintiff had failed opioid medications and Tramadol, but that she could attempt others though she would have to do so with another medical provider, since Dr. Watkins did not treat fibromyalgia. Id. She also did not believe that Plaintiff had rheumatoid arthritis, and that something else was causing her problems. Id. However, Dr. Watkins noted that she would have Plaintiff's thyroid levels checked "due to her degree of chronic muscle and joint pain as well as fatigue." Id.

On August 28, 2014, Plaintiff returned to Cardiovascular Associates of Monongalia General Hospital for a followup. At that point, though there were abnormalities in particular with her sinus rhythm episodes, Plaintiff was "stable from a cardiovascular standpoint." (R. 766).

On September 17, 2014, PA-C Feather wrote to Plaintiff's attorney relating the following events from her appointment that day:

> Mother accompanied patient today and broke down in tears because she is so concerned about her daughter's state of mental health. Mother has concerns that she may attempt suicide and not seek the help she needs. Patient in turn became tearful. Patient states that she is so overwhelmed with anxiety symptoms and severe depression that she just shuts down, rather than embracing her illness. She is unable to hold a job and has difficulty maintaining daily activities on her own. She has to be prompted to do anything of importance pertaining to appointments, medication compliance, school and other obligations/paper work that may need to be completed.

(R. 746).

Plaintiff saw Shawn Long, M.D. with Cheat Lake Physicians on May 15, 2014 to establish care with him as her primary care physician. (R. 771). She remained his patient and at a followup visit on September 4, 2014, asked Dr. Long to summarize her medical problems pursuant to this application. Id. Dr. Long obliged, outlining the treating specialists she sees, conditions, medications, history, and symptoms. Id.

### 3. Medical Reports/Opinions

#### a. *Narrative Summary and Medical Questionnaire completed by treating physician Shawn Long, M.D.*

In relevant part, Dr. Long has been focusing his treatment of Plaintiff since May on her fibromyalgia. (R. 771). He explained that her rheumatology consult with Dr. Watkins ruled out any inflammatory arthropathy or rheumatoid arthritis, and thus fibromyalgia was the most likely cause of her many symptoms. Id. He prescribed her two medicines used to treat fibromyalgia – Lyrica, and when that was not covered by insurance, Cymbalta. Id. He further observed:

> In addition to the above symptoms, another concern certainly would be medication side effect as I told her treatment would be trial and error based on these diagnoses. Some medications certainly can give side effects of drowsiness, sleep disorder, etc. that may make it difficult to keep a job at this time. The time frame would be difficult to speculate at the overall treatment of fibromyalgia is, unfortunately, very difficult with no guarantee of consistent improvement of symptoms with any one type of medication regimen.

(R. 772). Pursuant to Dr. Long's closing to contact him with any questions or for medical information, Plaintiff's attorney sent Dr. Long a series of questions about her various conditions and symptoms, which Dr. Long completed on October 1, 2014. (R. 773). In it, he indicated that he believes Plaintiff objectively suffers from peripheral sensory neuropathy, polyarthritis of unknown etiology, which – coupled with myofascial pain – is consistent with fibromyalgia. Id. Dr. Long further believes that Plaintiff has migraine headaches which continue to occur on a weekly basis in spite of treatment, and that her reports as to frequency are credible. (R. 774). He believes that her reports of migraines and pain are credible and interfere with her daily functioning. Id.

#### b. *Disability Determination at the Initial Level*

Plaintiff was determined to have the following severe medically determinable impairments: migraine headaches, osteoarthrosis and allied disorders, endometriosis, and spine

disorders; as well as anxiety disorder, which was considered non-severe. (R. 75). Plaintiff was considered "mostly credible" with regard to her subjective complaints, with the exception that her reported memory and concentration problems appeared to be inconsistent with the results of her consultative examination. (R. 76).

On June 26, 2012, agency reviewer Atiya Lateef, M.D. reviewed Plaintiff's records and completed a physical residual functional capacity ("RFC") assessment. (R. 76). Dr. Lateef found that Plaintiff had the following exertional limitations: Plaintiff could occasionally lift and/or carry twenty pounds, climb ramps/stairs, stoop, balance, kneel, crouch, and crawl. (R. 77). Plaintiff could frequently lift and/or carry ten pounds. Id. Plaintiff could sit, or stand and/or walk, for about six hours in an eight-hour workday. Id. Plaintiff could engage in unlimited pushing and/or pulling, albeit within her lift/carry restrictions. Id. Plaintiff could never climb ladders, ropes, or scaffolds and was to avoid unprotected climbing altogether. Id. As to environmental limitations, Plaintiff was to avoid even moderate exposure to hazards, and her physical RFC was reduced to light. (R. 78).

On June 26, 2012, agency reviewer Joseph Shaver, Ph.D. reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") assessment. (R. 75). Dr. Shaver found that Plaintiff had a medically determinable impairment of anxiety-related disorders that was non-severe. Id. Dr. Shaver acknowledged that Plaintiff had "significant" limitations in her activities of daily living, but that appeared to be primarily a result of her physical condition; he felt that her anxiety alone caused mild limitations in restriction of activities of daily living. Id. Dr. Shaver felt that Plaintiff had no difficulties in maintaining social functioning or concentration, persistence, or pace because the MSE indicated relevant factors as falling within normal limits. Id. Lastly, Dr. Shaver found no repeated episodes of decompensation. Id.

### c. *Disability Determination at the Reconsideration Level*

Plaintiff requested reconsideration based on changes reported in June 2012, with the additional diagnoses of auto-immune disease and neuropathy. (R. 83). Subsequently, on December 8, 2012, agency reviewer Jim Capage, Ph.D. reviewed the prior PRT assessment as well as updated medical information from Dr. Brizuela, and affirmed Dr. Shaver's assessment without further explanation. (R. 89-90).

On December 13, 2012, agency reviewer Cindy Osborne, D.O. reviewed the prior RFC assessment of Dr. Lateef and concurred with most of the prior assessment, with some exceptions. (R. 91). Dr. Osborne considered the additional "pain and limitations of polyarthritis [/]fibromyalgia" and added that, in addition to all of the prior limitations listed, Plaintiff must also avoid concentrated exposure to vibration and extreme cold and heat. (R. 92). Dr. Osborne concurred that the RFC should remain limited to "light." Id.

### d. *Consultative Examination Report from John Damm, Ph.D.*

On June 13, 2012, John Damm, Ph.D. completed a Clinical Interview (CI) and Mental Status Examination (MSE) of Plaintiff. (R. 373). Plaintiff reported prior treatment and counseling by Dr. David Allen, attending by her estimation "five or six" sessions previously. (R. 374). She advised that her anxiety and depression are related in part to her childhood home having burned down, as well as her current medical problems; and that she also experiences panic attacks with increasing frequency in the last 12 months. Id. She reports having enrolled in West Virginia University in Fall 2011, but having to withdraw twice since then. (R. 275). She wants to attend, but believes that she may only be able to manage online classes because walking to campus and to and from classes has been difficult. Id. She reported as to daily activities that

she sleeps a lot; at this point, she was doing her own cooking and laundry, reading and watching movies, drawing and playing musical instruments. Id.

At the mental status examination, results were all within normal limits. Dr. Damm's diagnostic impression was Generalized Anxiety. Id. He noted that Plaintiff's prognosis for improvement "seems good [if she received] mental health services." (R. 376).

## C.     Testimonial Evidence

At the ALJ hearing held on September 22, 2014, Plaintiff testified that she was unmarried and lived with a roommate. (R. 45). She had graduated from high school and had attempted to go to college, but could not complete her courses due to her conditions. (R. 46).

> Q      And how well did you do in college?
> A      I did very, very horribly. I was getting F's because I couldn't go to class or I would have to leave class early and then I withdrew and then I tried to attempt to go back and it was the same thing again.
> Q      What was -- why were you not doing -- I mean, what was making you not do so well?
> A      Just being able to go to class, because I'd usually have a migraine and if I was feeling okay that day, I'd leave the house probably two hours and the sunlight or the fluorescent lights or something would trigger a migraine and I would have to go back home, because I couldn't go on -- because I'd be vomiting from the migraines or in so much pain that I couldn't walk.

(R. 54).

As to prior employment, Plaintiff testified that she had worked in high school for Catherine Summers and at Dairy Queen, as well as at Buckle, but left when she went to college. (R. 47-48). She most recently worked at the Children's Place, working part time only 10 – 15 hours per week, but was unable to keep that employment with her conditions. (R. 47). The ALJ instructed the Vocational Expert that "there will be no past work in this case." (R. 48).

Plaintiff further testified that the conditions that prevent her from working include chronic migraines, peripheral sensory neuropathy, arthritis, and fibromyalgia. (R. 48). Plaintiff testified that she started to get migraine headaches in June of 2011, and gets headaches three to

four times per week on average, though it can be more. (R. 49). When she gets them, "[she] can be down for six hours or . . . for three days." Id. Plaintiff's current treatment for migraines includes pain medication and Nucynta. Id. She has "tried a lot of preventative medication [in the past], but nothing has worked yet." Id. She also tried botox injections, but saw no improvement in her migraines. Id. She sometimes goes to the Emergency Room when she has a migraine, which usually results in a six-hour stay while they try different things to try to get rid of it. (R. 60).

Plaintiff receives monthly intravenous immunoglobulin ("IVIG") treatments for peripheral sensory neuropathy. (R. 50). A nurse comes to her home once a month in the morning and stays there for eight hours while Plaintiff receives her treatment through an IV. (R. 55). That treatment has helped, in that it "stops with some of [her] shakiness in [her] hands," and stop her feet from falling asleep as much; however, she does still have spasms in her hands and feet. Id. She also testified that it tends to wear off after two weeks, and that she has tried to get more frequent IVIG treatments authorized, but her insurance won't pay for it and she cannot afford it herself. (R. 56). While she does do better when her treatments are fresh, after they wear off she has "a lot of trouble [with her] motor function," and difficulty doing things "like picking up small items or doing small tasks." Id.

Plaintiff testified that she was diagnosed with arthritis in 2011, but has not yet found out what type of arthritis she has. Id. She has seen a rheumatologist who ruled out rheumatoid arthritis, but Plaintiff expected to be referred to another specialist for more tests. Id. She takes Indomethacin and Plaquenil for arthritis. (R. 51). Plaintiff was also diagnosed with fibromyalgia in 2012, for which she takes Cymbalta. (R. 51). Plaintiff's attorney questioned her about how these two conditions affect her ability to lift and carry things:

> A   It does greatly. Usually I can barely carry any groceries. If I do carry any, I'll have to have someone help me because I have muscle weakness and skeletal weakness and my muscles exhaust very, very easily. Like I can't stand for probably more than 15 minutes, sitting more than probably 20 or 30 minutes. My hips start to ache really badly and my sacroiliac joints -- my hands cramp easily when I write or type and stuff like that.

(R. 58).

Plaintiff also sees a psychiatrist for depression, which was diagnosed around 2010 – 2011, and bipolar disorder, which was more recently diagnosed. (R. 51). At the time of the hearing, Plaintiff had been treated for bipolar disorder for about two months, and was taking Depakote for it as well. Id. Plaintiff testified that the medications she takes have significant side effects:

> Q   And what side effects did they have?
> A   A lot, a lot of fatigue. Nausea, cramping, dizziness. And I'm also taking a beta blocker to lower my heart rate and a lot of times they give me like low blood pressure as a side effect, so I can't like stand up very fast or do certain things like that.

(R. 52). She also has difficulty in her interpersonal relationships and interacting with others:

> A   I'll lash out a lot or will be easily upset to where I'm crying. I'm easily triggered to have passive suicidal thoughts, a lot of anxiety, and stuff like that.
> Q   What do you do when you feel -- start feeling this way?
> A   It either results in a panic attack or some type of melt down usually or a fight with her or whomever my anger is pointed at at the time.

Plaintiff takes Nucynta for pain, as well as a muscle relaxer if her pain is especially bad, but the muscle relaxers make her fall asleep shortly after taking them. (R. 52-53). She has to take muscle relaxers five times a week, usually. (R. 53). In addition to medications, Plaintiff also has other things she does to try to get rid of her headaches:

> A   I try to like take a shower. I put on ice packs, I put on heating packs, I sit in a dark room. It usually has to be like a cool room, no sounds, no smells, no light at all.
> Q   Well, how often are you having to sit in a room like you just described?
> A   Probably five days a week, because if I have like fluorescent lights for too long a period of time or I'm in sunlight for more than about 30 minutes, I get a migraine or if I look at like a computer screen for more than of like an hour.
> Q   Oh, five days a week, how much time each day?
> A   Probably like eight or 10 hours a day.

(R. 53).

Plaintiff testified that she has a lot of cramping as a result of her endometriosis that necessitated multiple surgeries – in 2010, 2013, and 2014. (R. 57). Each time she has one of these surgeries, she has about a month of recovery time in which she's not supposed to lift anything or walk significant distances. Id.

Plaintiff also testified regarding her daily activities. Asked by the ALJ how she spends her days, Plaintiff testified "usually lying in bed. I try to do as much as I can and then I'm usually stopped by a migraine." (R. 52). She does occasionally go to the store herself, but has to have someone accompany her in case she gets a migraine. (R. 53). Most often, though, she will send a list and money with her roommate for him to get her groceries for her. (R. 54).

> Q    How are you able to live by -- like, well, not necessarily by yourself, but how are you able to live away from your home, from your original home?
>
> A    My roommate, when he moved in, when I moved out, it was - - I was okay by myself in the beginning and then when I got sick I had asked him to move in with me with the stipulation that he would help me and help take care of the house. So he does the cleaning and the cooking and he has to like fold my laundry and stuff and it's pretty much the only outside interaction with friends I have, because I can't go out and hang out with friends or have a social life really. And if I have to go to the ER for a migraine or something like that, he'll take me.

(R. 59).

## D.    Vocational Evidence

Also testifying at the hearing was Larry Ostrowski, a vocational expert.  Mr. Ostrowski characterized Plaintiff's past work as [Insert Past Work as described by VE in transcript].  With regards to Plaintiff's ability to return to her prior work, the ALJ determined that Plaintiff had no past relevant work in this case. (R. 62). Rather, the ALJ  questioned Mr. Ostrowski regarding Plaintiff's ability to perform other work at varying exertional but unskilled levels:

> Q    There is no past relevant work in this case. If I ask that you assume an individual with the same age, education, and past work experience as the claimant with the following

abilities? Is that individual is capable of light exertional level work, can never climb ladders, ropes, or scaffolds, can occasionally climb ramps or stairs, balance, stoop, crouch, kneel, or crawl. Said individual must avoid concentrated exposure to extreme cold, extreme heat, excessive vibration, and must avoid all exposure to any hazards, such as dangerous moving machinery and unprotected heights. Said individual is capable of work in a low stress job defined as having no strict production quotas and is capable of simple, routine, and repetitive tasks and is capable of occasional interaction with the general public, coworkers, and supervisors. Can an individual with these limitations perform work?

A      Yes, your honor. There would be the work of a storage facility rental clerk. This is a light and an unskilled job with an SVP of 2. In the local economy there are 180 jobs. In the national economy, 179,000 jobs. The DOT is 295.367-026. There would be the work of an office helper. This is a light and unskilled job with an SVP of 2. In the local economy, there are 85 jobs. In the national economy, 86,000 jobs. The DOT is 239.567-010. There would be the work of a marker. This is a light and an unskilled job with an SVP of 2. In the local economy there are 250 jobs. In the national economy, 250,000. The DOT is 209.587-034.

Q      If you add to that first hypothetical an additional limitation, that is that individual is capable of occasional overhead reaching, would those jobs remain available?

A      Yes, your honor.

Q      If you add to that a limitation that said individual is capable of frequent fingering and handling and feeling, would those jobs remain available? And they would be bilaterally.

A      Yes, your honor, with no changes in the responses.

(R. 62-63).

Finally, the ALJ questioned Mr. Ostrowski about Plaintiff's ability to work if she is completely credible as to the severity of her condition:

Q      Okay. At the sedentary exertional level with the limitations given, would there be jobs available for this individual?

A      Just to clarify, your honor, would that include the limitations regarding occasional overhead reaching and frequent fingering, handling, and feeling?

Q      Yes.

A      Yes, your honor. There would be the work of a charge account clerk. This is a sedentary and an unskilled job with an SVP of 2. In the local economy there are 50 jobs. In the national economy 33,000 jobs. The DOT is 205.367-014. There would be the work of a telephone quotation clerk. This is a sedentary and an unskilled job with

an SVP of 2. In the local economy there are 75 jobs. In the national economy 89,000. The DOT is 237.367-046. There would be the work of a document preparer. This is a sedentary and an unskilled job with an SVP of 2. In the local economy there are 200 jobs. In the national economy 143,000 jobs. The DOT is 249.587-018.

Q      And if the individual must be afforded the opportunity for brief one to two minute changes of position at integrals not to exceed 30 minutes without being off task, would the jobs at the sedentary level that you just gave remain available?

A      Yes, your honor.

Q      Would the jobs that you gave at the light exertional level remain available with that additional limitation?

A      I believe the -- this individual would be able to do the work as the storage facility rental clerk and office helper, but not the job of marker.

Q      Would there be another job at the light exertional level that would fit the limitations given?

A      Yes, your honor. There would be the work of a mail clerk. This would be an individual working in a mail room of a business as opposed to working for the postal service. It is a light and an unskilled job with an SVP of 2. In the local economy there are 60 jobs. In the national economy, 70,800. The DOT is 209.687-026.

Q      And if the individual were off task or to miss work 20 percent of the work week or greater, would there be jobs available for this individual?

A      No, your honor.

Q      How much time off task do most employers tolerate?

A      There are studies that show that an individual can be off task up to 10 percent of a work period and still generally be able to maintain levels of productivity required by employers.

Q      And how many unexcused or unscheduled absences do employers tolerate from their employees per month?

A      It is my experience in working with employers that they will tolerate an individual being late to work, leaving work early, or missing an entire day and they will tolerate up to two incidents in a -- per month before the individual may experience consequences regarding the incidents.

Q      Is your testimony consistent with the DOT and the SCO?

A      Yes, your honor, with the exception of there being the sit stand option posed in the hypothetical. A sit stand option is not defined in the Dictionary of Occupational

Titles and related references. My opinion regarding the impact and the need for a sit stand option has on performing the job or jobs is based on my having performed the job myself or my having performed job analysis of jobs or my having becoming with how a job is performed otherwise.

(R. ).  Plaintiff's attorney next questioned the VE regarding his testimony:

Q       Now, Dr. Ostrowski, going with this concept of off task, because if a person was missing work for I think you said what? Two days or more -- the consequences are going to start happening?

A       Yes.

Q       So if a person was let's say in the hospital during this time for two days or more how would that affect employment per month during this time?

A       Well, it would depend on how long the person were to have been employed and in what position they're in, if it is a very critical position or a lot of issues like that. So with what you said, I really can't fully respond to it.

Q       Okay. Well, if you're in the hospital, you're not at your work station, correct?

A       Right.

Q       So that would make you off task? Not being at your work station?

A       Off task is more like the person is there working and then taking too many breaks or just daydreaming or just working slow or -

Q       Instead of okay. Laying down in a dark room while at work, would that be off task?

A       Absolutely.

Q       And if a person was at home, they would not be at work, correct?

A       That is correct, assuming the job is performed at a place of employment in an allotted home.

(R. 66-68).

## E.       Report of Contact Forms or Disability Reports

An undated Disability Report Form listed Plaintiff's conditions as "fully body arthritis, endometriosis, severe migraines, irritable bowel, both shoulders out of socket, anxiety, depression, hypertension in spinal column, possible ADHD, [and] chronic cervicitis." (R. 202).

Plaintiff's medications included Allegra (for allergies), Balziza (endometriosis), Estrace (chronic cervicitis), Flonase (allergies), Indomethacin (arthritis), Nortriptyline (sleep aid and nausea relief), and Nucynta (pain relief). (R. 204). Plaintiff reported recent medical treatment in both office visits and emergency room visits, for migraines, irritable bowel, allergies, endometriosis, and dislocated shoulders. (R. 207). She reported having bloodwork, and MRI/CT scan of her abdomen, and an x-ray of her abdomen in 2011. Id.

A subsequent disability report pursuant to Plaintiff's appeal listed a change in her conditions as of June 2012, with the addition of auto-immune disease and neuropathy. (R. 230). She reported that her mental fogginess was worse, and she has difficulty writing and typing. (R. 237).

**F.     Lifestyle Evidence**

> ***a.  Adult Function Report***

On an adult function report dated April 26, 2012, Plaintiff reported that she has chronic migraines "every other day, sometimes more," and cannot function during a migraine. (R. 211). When she gets a migraine, her motor and language skills are impaired, she forgets what things are called, and is sensitive to bright lights. (R. 220).

She reports arthritis "from the back of [her] head down." (R. 220).  Plaintiff sleeps poorly, her joints constantly hurt, and she cannot stand, sit, or lay for long periods of time without being in pain. Id. She reports that she cannot climb stairs "effitantely" [sic]. Id. Plaintiff reports that her hands and feet go numb, and her hands shake so that, when turning them palms-upward, it looks as if she is playing a piano. (R. 220). Her arms tire easily as well. (R. 221). Plaintiff reports being unable to lift anything heavy due to dislocated shoulder – that the "socket is bigger than [the] ball joint [and it is] held together by [tendon] and muscle." (R. 220).

Plaintiff reports that her anxiety causes her to have panic attacks, Id., and that her situation causes her to have depression, which in turn increases her fatigue. (R. 221). Irritable bowel syndrome causes Plaintiff stomach pain, and she reports going to the bathroom five times a day. Id. She also has pain from endometriosis and from her jaw clenching at night. (R. 220).

Plaintiff reported that on a day when she has a migraine, she "just lay[s] around." (R. 214). On a good day without migraines, Plaintiff wakes up, takes her medicine, eats, does laundry and cleans, takes medicine again, makes dinner, hangs out with friends, takes medicine a third time, and sleeps. Id. Plaintiff does not take care of any other people, but does have a puppy. Id. Plaintiff reports that she feeds, waters, and takes her puppy outside when she can. Id. When Plaintiff is "hurting or having [a migraine]," she is unable to care for him; her mother takes the puppy home to care for him until Plaintiff is able to resume caring for him. Id.

Plaintiff reports that her arthritis causes her to wake up "every hour on the hour," pursuant to "constant tossing [and] turning," and clenching her jaw when sleeping due to temporo-mandibular joint (TMJ) issues. (R. 214). When she has a migraine, she cannot sleep. Id. Plaintiff indicated that she was able to handle most of her personal care without problems, but reported difficulty using the toilet due to constipation or diarrhea from IBS, and problems doing laundry due to difficulty getting up and down the stairs. Id.

Plaintiff reports that she prepares her own meals, but is now limited to things that are "quick and easy" and require less preparation and cooking time, such as sandwiches, frozen dinners, fresh vegetables, etc. (R. 215). Plaintiff reports that she cleans and does laundry on days that she is not in too much pain. Id. She goes outside every day that she does not have a migraine, though she does not drive and is limited to either riding in a car, or taking a shuttle bus.

(R. 216). Plaintiff shops for groceries and necessities once every two to three weeks, for about an hour. Id. Plaintiff reported that she was able to manage her own finances without problems. Id.

Plaintiff's hobbies and interests include reading, watching television, playing video games, listening to music, spending time with friends, and doing yoga. (R. 217). She reported doing at least one of these activities every day, though all activities are limited if she has a migraine, and her ability to do yoga is limited due to arthritis. Id. Plaintiff reports the extent of her social activities involve going to a friend's house, hanging out, talking, listening to music and watching movies. Id. She also reports that her ability to engage in those social activities is more limited now because of her headaches, and she also had to withdraw from college for two semesters as well. (R. 218).

Plaintiff's conditions affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember things, complete tasks, concentrate, understand, and use her hands. (R. 218). Her conditions did not affect her ability to follow instructions or get along with others. Id. Plaintiff reported being able to walk for about fifteen to twenty minutes usually before having to stop and rest for about five minutes, though the duration of her rest depends on how she is feeling that day. (R. 218). Plaintiff reported being able to pay attention as long as she doesn't have a migraine. Id. When she is in pain, she cannot concentrate or comprehend things. (R. 222). She reported following written and spoken instructions very well, and no problems getting along with authority figures or other people. (R. 218-19). She reported handling stress and changes in her routine well. (R. 219). Plaintiff reports that the medication she takes for pain (Nucynta) makes her drowsy. (R. 220).

### b.  Personal Pain Questionnaire

On October 11, 2012, Plaintiff completed a personal pain questionnaire describing and

elaborating on the pain she experiences. (R. 225). Plaintiff described the pain from her migraine headache as aching, throbbing, and crushing. Id. She explained that "the pain is excruciating. I am confined to bed. It must be dark and silent. I cannot complete any tasks." (R. 225). She reported getting migraines four times per week, lasting eleven to twelve hours per day when one occurs. Id. Triggers include sunlight or other bright lights, stress, "being jostled," loud noises, strong smells, certain foods, concentrating; sometimes she gets migraines with no apparent trigger at all. Id. Plaintiff reported that "meds, ice pack, shower, dark rooms and resting make [her headaches] feel a tiny bit better," though she usually just has to wait for it to go away. Id. Plaintiff reported taking Nucynta for pain, and that it sometimes will relieve "a little bit" of her pain. (R. 226). She reported that the IVIG treatments cause her to have "severe migraines and nausea the entire week after the IV." Id.

Plaintiff described the arthritis pain in her joints, hips, knees, and neck as aching, burning, and crushing (R. 226). She reported this pain was "constant," and that she had it continuously. Id. "It's hard to sleep because of the pain," Plaintiff wrote; "Same days it gets so bad I cannot walk or move." (R. 227). Plaintiff reported that her arthritis pain is caused by "idiopathic sensory neuropathy." Id. She reported that "cold, rain, walking, standing or sitting in one position for too long" makes this pain worse. Id. She gets "some relief" from icy-hot, hot showers, and resting. Id.

Plaintiff next described her fibromyalgia pain as aching, stabbing, crushing, and "bruise-like." (R. 227). She reported the frequency as twice per month, lasting "usually a week." (R. 228). Plaintiff reported that "this pain is very bad[; she cannot] wear a bra and sometimes even shirts hurt." (R. 228). Plaintiff reports that this pain is made worse by her idiopathic sensory neuropathy, and that nothing makes it better. Id.

Plaintiff added additional painful conditions in the "remarks" section at the end of the form, having filled all of the other spaces allotted for painful conditions. (R. 229). She has endometriosis that is painful during her menstruation cycle. Id. She also noted "severe cramping" in her hands and feet, which makes it difficult to hold things for very long. Id.

### c. *Disability Report – Appeal*

On an undated Disability Report Form (Appeal), Plaintiff reported her conditions had worsened in that her "mental fogginess [sic] is worse and [she had] difficulty writing and typing." (R. 237). Her current medications included Allegra for allergies, Balziza for endometriosis, Estrace for chronic cervicitis, Flonase for allergies, Indomethacin for arthritis, Nortryptaline for insomnia and nausea, and Nucynta for pain. (R. 232). She also wrote that she "can only function when [her] body allows [her] to," and that her migraine pain "most times, does not allow [her] to fall asleep," and she feels that she cannot leave the house. (R. 233).

### d. *Additional Remarks*

On a separate handwritten page dated March 21, 2013, and titled "Section 6 – Work," Plaintiff elaborated as to her most recent employment:

> I got a job at a child's clothing store. The lady that hired me was very sympathetic and understanding of my illness. She herself had suffered with migraines. She knows that I may not be dependable because of my problems. If I have to sit in back, or go because of the nausea, she works with that. I work [one] day a week, [four] hours a day. That is all my body will allow me to do. She understands if I have a bad time after IVIG it will effect if I can work or not. She gives me the [one] normal part of my life. Those are a hard four hours for me. I don't just do my job, I struggle with my pain and getting through those four hours. It exhausts me. Then it increases my pain. (It's like if you were to brake [sic] your ankle, and instead of staying off of it, you just kept standing on it. It would create a pain that is unbearable. Well, that's how I get when I stand and move my points that are already hurting. Everything intensifies. Then the added fatigue and naus[ea].

(R. 106-7).

On a form titled Claimant's Recent Medical Treatment, Ms. Poling noted that she'd been

seeing Dr. Brizuela (neurologist), Dr. Kupec for her IBS and upper gastric abdominal pain, Dr. Harman for endometriosis, and Dr. Hall for kidney stones. (R. 248). She additionally reported on a handwritten letter two recent hospitalizations – at Monongalia General Hospital on April 4, 2013 for "laparascopic lysis of adhesions, excisions, and cauterization of endrometriosis, uterosacral nerve ablation, hysteroscopy, dilatation & curettage;" also to the Mon General Emergency Room "a few times" since the last update. (R. 250). She next wrote that she had recently seen cardiologist Dr. John McKnight, and primary care physician Dr. Shawn Long, but would additionally be seeing a rheumatologist and psychiatrist (for depression, anxiety, and panic attacks) in the near future. (R. 251).

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.    The claimant has not engaged in substantial gainful activity since April 18, 2012, the application date (20 CFR 416.971 et seq.).

2.    The claimant has the following severe impairments: migraine headaches; polyarthritis/osteoarthritis (of unknown etiology); diagnosis of possible fibromyalgia in June 2014; history of endometriosis/chronic cervicitis; idiopathic small fiber sensory neuropathy; major depressive disorder/bipolar disorder; and generalized anxiety disorder (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(h) subject to some

additional nonexertional limitations. More specifically, the claimant can frequently finger, handle, and feel bilaterally and occasionally climb ramps or stairs, balance, stoop, crouch, kneel, or crawl, but can never climb ladders, ropes, or scaffolds. She must avoid concentrated exposure to extreme cold, extreme heat, and excessive vibration and all exposure to any hazards such as dangerous moving machinery and unprotected heights. The work must be limited to simple, routine, and repetitive tasks in a low stress job defined as having no strict production quotas. She is capable of occasional interaction with the general public, co-workers, and supervisors. Finally, the claimant must be afforded the opportunity for brief 1-2 minute changes of position at intervals not to exceed 30 minutes without being off-task.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on February 22, 1993 and was 19 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English. (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 18, 2012, the date the application was filed (20 CFR 416.920(g)).

(R. 20-32).

## VI.    DISCUSSION

### A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co.</u> <u>v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" <u>Shively v. Heckler</u>, 739 F.2d 987, 989 (4th Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)).

In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law. "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.      Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is not supported by substantial evidence." (Pl.'s Mot. at 1, ECF No. 11).  Specifically, Plaintiff alleges that the ALJ erred by:

1.      Misrepresenting the contents of physical examinations (ECF No. 12 at 6) and other evidence in the record (<u>Id.</u> at 8-10);

2.      Basing her credibility conclusion on inaccuracies and speculation. (<u>Id.</u> 8-10).

3.      Discounting a treating physician's opinion on improper grounds in violation of SSR 96-2p (<u>Id.</u> at 10);

4. Failing to indicate how much weight was given to other opinion evidence (Id. at 12).

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br."), ECF No. 12). Plaintiff asks that the "claim be remanded to allow the ALJ to accurately portray the evidence and produce an opinion based on the application of the Commissioner's rules." (Id. at 14).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by the evidence of record as a whole and should be affirmed." (Def.'s Mot. at 14).

## C.    Analysis of the Administrative Law Judge's Decision

### 1.    Credibility Analysis

The determination of whether a person is disabled by pain or other symptoms is a two-step process. Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96–7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment[2] capable of causing the degree and type of pain alleged. Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of the subjective allegations in light of the entire record. Id. Social Security Ruling 96–7p, which sets out factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, was superseded by SSR 16-3p effective March 28, 2016.[3] Rather, in addition to medical evidence and a plaintiff's statements, the factors remain:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;

---

[2] Step one is fulfilled here. The ALJ in his decision stated that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ." (R. 17). Thus, the Court addresses only Step Two.
[3] Federal Register Vol. 81, No. 51, page 14166, subsequently corrected by Federal Register Vol. 81, No. 57, page 15776; also published on SSA website, https://www.ssa.gov/OP_Home/rulings/di/01/SSR2016-03-di01.html.

4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

A plaintiff's subjective statements about the intensity, persistence, or pace of her symptoms need not be corroborated by objective medical evidence to be accepted. Hines v. Barnhart, 453 F.3d 559, 565 (4th Cir. 2006) ("Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain is so continuous and/or so severe that it prevents him from working a full eight hour day." (footnote omitted)). Indeed, 20 CFR 416.929 directs the ALJ to take a claimant's subjective statements into account *unless* they *cannot* reasonably be accepted as consistent with the objective medical and other evidence.[4]

Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989–90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09cv55, 2011

---

[4] (3) Consideration of other evidence. **Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms.** The information that you, your treating or nontreating source, or other persons provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living) is also an important indicator of the intensity and persistence of your symptoms. **Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account** as explained in paragraph (c)(4) of this section in reaching a conclusion as to whether you are disabled. (emphasis added).

WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets the basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08cv178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)). It follows that a credibility determination that fails to meet the basic duty of explanation can – and should - be reversed.

To meet the duty of explanation, a determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *4. However, in so doing, "An ALJ may not select and discuss only that evidence that favors his ultimate conclusion." Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995) (internal citation omitted). Nor may the ALJ "simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." Lewis v. Berryhill, No. 15-2473, 2017 WL 2381113 (4th Cir. June 2, 2017) (internal citation omitted). Rather, the ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning. An ALJ's failure to consider an entire line of evidence falls below the minimal level." Diaz, 55 F.3d at 307 (internal citation omitted).

a. **ALJ Kostol's credibility analysis is flawed because it is based on clear evidentiary inaccuracies and omissions that evidence a misunderstanding of the record.**

ALJ Kostol claims that Plaintiff "sought no treatment for any mental health issues until April 2014." (R. 30). However, the record contains numerous mentions of exactly that, well before April 2014. Prior to her mental status examination with Dr. Damm on June 30, 2012,

Plaintiff was seen by Dr. David Allen at Morgantown Pastoral Counseling center for "five or six sessions." (R. 374). Treatment notes from Emily Sarkees clearly reference Plaintiff having been "prescribed Zoloft *as a child*." (R. 725), and having seen a therapist *in high school*, where she struggled with significant mental health issues including anxiety, bereavement, depression, and self-harm. (R. 721). In fact, the record suggests that Plaintiff has been in some form of mental health treatment at a number of stages of her life, going back many years. The assertion that Plaintiff sought *no* treatment for any mental health issues until April 2014 is not only contradicted directly, it suggests a lack of attention to the record, which hardly reassures the reviewing court.

This is not the only claim ALJ Kostol makes that is concerning. ALJ Kostol repeatedly claims that "claimant's orthopaedist indicated that despite the claimant's positive tender points she did not see fibromyalgia as being present (Exhibit 36F p. 2)," (R. 28), and that [t]he orthopaedist . . . did not see evidence of fibromyalgia" "despite having positive tender points." "(Exhibit 36F p. 2). (R. 29). Apparently, this played some not-insignificant role in her credibility determination. However, ALJ Kostol has clearly misunderstood Dr. Watkins' statement and the evidence in the record, as its actual meaning is quite different.

Dr. Watkins, who practices in the rheumatology section of the Department of Orthopedics, saw Plaintiff for the express purpose of evaluating her for "*rheumatoid arthritis* due to her joint pain." (R. 768) (emphasis added). Dr. Watkins determined that Plaintiff did *not* have rheumatoid arthritis. (R. 769). She noted that Plaintiff *does* meet the diagnostic criteria for fibromyalgia, however, displaying *18 out of 18 tender points* (when only 11 out of 18 are necessary for a diagnosis per SSR 12-2p). (R. 769). Rheumatoid arthritis thus being eliminated as a possible cause of her pain, there was little more that Dr. Watkins could contribute at that

point. She explicitly states that Plaintiff's "family physician" and her "psychiatrist" would be the appropriate physicians to continue treating the fibromyalgia Dr. Watkins *agreed that Plaintiff had* – noting that "*they* could try something *for her fibromyalgia* like [T]razodone, Elavil, Neurontin or Lyrica." Id.

Thus, when Dr. Watkins noted that she "[does] not see fibromyalgia and I am not sure what would combine with her Depakote," she was not referring, as the ALJ incorrectly interpreted, to *evidence* of fibromyalgia or whether Plaintiff *had* fibromyalgia or not. Rather, she was referring to the fact that *she does not see fibromyalgia patients* in her practice, and thus was unsuited to prescribe medications or offer continued treatment for that condition. Dr. Watkins' statements did not suggest that Plaintiff does not have fibromyalgia, as the ALJ erroneously concluded. Because ALJ Kostol cited this erroneous conclusion as evidence that supported a diminished credibility finding, that finding is clearly flawed.

Further, ALJ Kostol also appears to have either missed or ignored other significant evidence:

> Moreover, as to the claimant's allegation of fibromyalgia, while there is a possible diagnosis of the impairment by an orthopaedist June 2014 and the claimant is prescribed pain medication for headaches and unspecified arthritis by her neurologist, **the objective requirements needed to establish this impairment are not contained in the evidence**. **The orthopaedist** even indicated in her assessment that despite having positive tender points she did **not see evidence of fibromyalgia** (Exhibit 36F p. 2).
> More specifically, in order to find a medically determinable impairment of fibromyalgia, the record must contain: (1) **a history of wide spread pain** in all quadrants of the body that has persisted for at least three months; (2) **at least eleven positive tender points** on physical examination found bilaterally and both above and below the waist that are determined by a physician performing digital palpitation with an approximate force of nine pounds; and (3) **evidence that other disorders** that could cause the symptoms or signs **were excluded** (SSR 12-2P).

(R. 29) (emphasis added). As discussed, the claim that Dr. Watkins did not see evidence of fibromyalgia is inaccurate. The 18 out of 18 tender points Dr. Watkins observed upon physical

33

examination of Plaintiff *is direct evidence* of fibromyalgia, as per the Commissioner's own rules (SSR 12-2p), which ALJ Kostol herself cited. Id.  This record documents Plaintiff's complaints of widespread pain for far longer than three months, including Plaintiff's application, adult function report dated April 26, 2012 (R. 220), pain questionnaire dated October 11, 2012 (R. 227), and at length throughout her treatment history, spanning a number of years.

There is evidence in this record that other disorders were excluded, including Dr. Watkins' elimination of rheumatoid arthritis (R. 769). Dr. Long noted that inflammatory arthropathy had also been ruled out, and thus fibromyalgia *was* the most likely cause of Plaintiff's symptoms. (R. 771). Dr. Brizuela noted that an antinuclear antibody ("ANA"), serum, and protein electrophoresis tests came back normal, which ruled out other suspected causes (R. 385). Dr. Watkins also checked Plaintiff's thyroid levels to ensure that was not an underlying cause of pain and fatigue. (R. 769).  Even under the alternative criteria ALJ Kostol cited and also found inexplicably lacking, this is still so:

> The claimant can also be found to have fibromyalgia if: ( 1) there is a **history of wide spread pain** (as noted above); (2) there is repeated **manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions**, especially manifestations of **fatigue**, **cognitive or memory problems**, **waking un-refreshed**, **depression**, **anxiety**, or **irritable bowel syndrome**; and (3) **evidence that other disorders** that could cause the symptoms or signs **were excluded** (SSR 12-2P). **None of these requirements were met in this case.**

(R. 29) (emphasis added).

This record contains repeated manifestations and complaints of fatigue (R. 52, 106, 303, 390, 458, 508, 744, 769, 774), depression (R. 51, 69, 373, 480, 721-26, 744, 746, 768, 775), anxiety (R. 59, 69, 74-75, 373, 374, 376, 480, 493, 721-28, 746, 760, 768, 775), irritable bowel syndrome (R. 374-76, 476-77, 488-89, 493, 499, 532, 566, 760, 768), cognitive/memory problems (R. 74, 108-9, 218, 277), which SSR 12-2p *specifies* as including "fibro fog," relevant

to Plaintiff's specific complaints of "mental fogginess/forgetfulness" (R. 237, 308, 331, 570) and concentration problems (R. 744). SSR 12-2p also elaborates in footnotes 9 and 10:

> [9] Symptoms and signs that may be considered include the "(s)omatic symptoms" referred to in Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR Preliminary Diagnostic Criteria. We consider some of the "somatic symptoms" listed in Table No. 4 to be "signs" under 20 C.F.R. 404.1528(b) and 416.928(b). These "somatic symptoms" include **muscle pain**, **irritable bowel syndrome, fatigue or tiredness, thinking or remembering problems, muscle weakness, headache,** pain or cramps in the abdomen, **numbness or tingling, dizziness, insomnia, depression, constipation, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision,** fever, **diarrhea,** dry mouth, itching, wheezing, **Raynaud's phenomenon,** hives or welts, **ringing in the ears, vomiting,** heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, **shortness of breath,** loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms.

> [10] Some co-occurring conditions that may be considered are referred to in Table No. 4, "Fibromyalgia diagnostic criteria," in the 2010 ACR Preliminary Diagnostic Criteria as "somatic symptoms," such as irritable bowel syndrome or depression. Other co-occurring conditions, which are not listed in Table No. 4, may also be considered, such as **anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or** restless leg syndrome.

Id. (emphasis added).

This record additionally documents migraines (at instances too numerous to list in their entirety, but especially Dr. Brizuela's treatment notes at R. 321-350), muscle pain (R. 327, 330, 387, 398, 742, 769), weakness (R. 58, 329, 457, 459, 744), blurred vision (R. 308, 310, 314, 318, 331, 370, 374, 572, 576, 769), dizziness (R. 52, 303, 463, 465, 469, 565, 592, 765), insomnia (R. 493, 725), nausea (R. 52, 374, 398, 426, 443, 446, 453, 467, 592, 703), vomiting (R. 443, 446, 453. 592, 703), shortness of breath (R. 426, 471, 583-84, 742, 751, 764, 768), numbness and tingling (R. 57, 327, 328, 387, 390, 398, 453, 459, 461, 463, 465, 469, 508, 744), ringing in her ears (R. 469), jaw pain/temporomandibular joint pain (R. 331), and difficulty swallowing and talking (Reynaud's phenomenon) (R. 385, 398, 455, 463, 467, 471). The undersigned thus cannot determine how ALJ Kostol concluded that "objective requirements needed to establish this

impairment are not contained in the evidence," as the record contains ample such evidence upon review.[5]

Also troubling is what appears to be a misunderstanding of the medical evidence and the conditions the Plaintiff alleges. Plaintiff complains that ALJ Kostol cites "normal" medical records and findings that are not objectively "normal," nor described that way by the physicians who wrote them. (ECF No. 12 at 6). A recent Fourth Circuit decision on a very similar set of facts and issues is instructive here. In <u>Lewis v. Berryhill</u>, an ALJ cited findings characterized as "normal," when those records *also* noted the plaintiff's complaints of pain, some abnormalities, and treatments for pain. No. 15-2473, 2017 WL 2381113 (4th Cir. June 2, 2017). Such selective characterization is insufficient to support a determination. <u>Id.</u>

### b. Other evidence ALJ Kostol cites has no apparent nexus to the conditions at issue.

The ALJ in <u>Lewis</u> also failed to indicate how the results he cited "[bore] any nexus to [the plaintiff's complaint]" when he cited findings such as a normal gait in relation to a shoulder issue. <u>Id.</u> The Fourth Circuit held that the ALJ "applied an improper legal standard to discredit [the plaintiff's] evidence of pain intensity and the opinions of her treating physicians," and "failed to adequately explain the reasons for denying [] benefits given [the plaintiff's] extensive medical history." <u>Id.</u> These failures frustrated "meaningful review" as directed by <u>Radford v. Colvin</u>, 734 F.3d 288, 296 (4th Cir. 2013), and necessitated remand. <u>Id.</u>

Here, ALJ Kostol has essentially done the same. Her decision frequently cites "normal" findings and test results, which "overlook critical aspects of [Plaintiff's] medical treatment

---

[5] To the extent that Plaintiff did not necessarily experience all of these symptoms every single day, that is of little import as to credibility, especially in light of SSR 12-2p's assurance that, "[f]or a person with FM, **we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'**" (emphasis added). At minimum, the ALJ's duty is to resolve any perceived conflicts by explaining why she found certain evidence persuasive and other evidence less so, and thus a failure to address it entirely will not suffice – especially when, as here, there is significant weight of evidence to the contrary.

history" and have no apparent nexus, as <u>Lewis</u> instructs against. For example, ALJ Kostol does not explain how a lack of physical findings in any way contradicts Plaintiff's complaints as to a number of her conditions. Plaintiff alleges significant pain stemming in part from migraine headaches and fibromyalgia, among other conditions. Neither of these conditions can be observed via imagining studies, or have a diagnostic tests that would return a positive or negative result. <u>See</u> SSR 12-2p. For both of these conditions in particular, a lack of observable physical abnormalities on tests such as MRIs or CT scans or lab tests are in no way inconsistent with either a diagnosis or Plaintiff's subjective complaints. As such, there is no ascertainable nexus between the two, and ALJ Kostol fails to explain why she believes otherwise.

### c. Daily Activities

The ALJ's credibility determination largely consisted of a recitation of objective medical evidence. Of the seven factors articulated in 20 CFR 404.1529(c)(3), the ALJ discussed primarily daily activities and treatment. As to daily activities, the ALJ somewhat selectively cites Plaintiff's ability to perform some limited daily activities as negating her claims, but makes no mention of the fact that these are activities she can do *only when she does not have a migraine*. (R. 276-277, collecting same). The ALJ further characterizes these activities as "rather significant activities of daily living." <u>Id.</u> No logical connection between Plaintiff's self-reported daily activities and such a characterization is apparent, nor does the ALJ's decision assist in that endeavor.

Plaintiff in fact testified that she is largely dependent upon others, especially her roommate: "I was okay by myself in the beginning and then when I got sick I had asked him to move in with me with the stipulation that he would help me and help take care of the house." (R. 59). Her roommate now has to do the cooking and cleaning at their apartment, and folds her

laundry for her. Id. If she has to go to the emergency room for a migraine, her roommate drives her there. Id. She stated she does "occasionally" grocery shop, but she has difficulty doing it in terms of both standing and carrying the bags. (R. 58). As a result, if she does go, someone has to go with her in case she gets a migraine during. (R. 54). "Usually I'll send somebody with a list and money, though, my roommate who I've been friends with since probably about third grade . . . helps me do things." Id. She stated that she has difficulty going up and down stairs because of her joint pain. (R. 221). She had to withdraw from college courses and noted that the walk to campus and between classes was a significant barrier for her such that she was considering *online* classes (R. 375). If there is any inconsistency between Plaintiff's activities of daily living and her subjective complaints, it is not apparent from this record, and the ALJ has failed to provide sufficient explanation for the undersigned to understand how she was able to arrive at that conclusion with this record.

Further, such a conclusion is directly contrary to precedent. A claimant's daily activities are relevant evidence when assessing his alleged symptoms. 20 C.F.R. § 404.1529. However, "[w]e have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job *outside* the home." Louk v. Colvin, No. 2:16-CV-9, 2016 WL 7383814 at *22 (N.D. W.Va. Nov. 30, 2016)(citing Craft v. Astrue's, 539 F.3d 668, (7th Cir. 2008) quotation of Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006) (emphasis added)). Indeed, in contrast, the types of daily activities that negate credibility include significantly more demanding activities than the ones described by Plaintiff here. See Mastro v. Apfel, 270 F.3d 171 (4th Cir. 2001) (riding a bike, walking in the woods, and traveling to distant states without significant difficulty undermined claimant's subjective complaints of pain and fatigue); Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011) (driving, caring

for horses and dogs, riding horses and operating a tractor was conflicting evidence) (remanded on other grounds for new evidence); Kearse v. Massanari, 73 Fed.Appx. 601 (4th Cir. 2003) (cutting wood, mowing grass, and occasionally shopping contradicted a disability determination). Plaintiff's daily activities here thus hardly rise to a level that would negate her credibility under our precedent.

### d. Medications

The medication a claimant takes is evidence relevant to a credibility determination regarding allegations of pain. Kearse, 73 Fed. Appx. at *603[6] (taking only over-the-counter medications such as Tylenol and Motrin for pain supported finding that pain was not as severe as claimant alleged). Here, the record shows Plaintiff was prescribed Hydrocodone (R. 610, 622, 731), Oxycodone (R. 622, 624, 736), and Nucynta (R. 327-28, 374, 385, 390, 398, 448, 453, 467, 471, 476, 494, 508, 521, 610, 674, 719, 736) for pain. Hydrocodone is a prescription-strength Schedule II controlled substance and opioid pain medication designed to treat "chronic, severe pain."[7] Oxycodone is a prescription-strength pain reliever comprised of Hydrocodone and Acetaminophen, and designed to treat moderate to moderately severe pain "for which alternative treatment options (e.g. non-opioid analgesics are inadequate).[8] Nucynta is a prescription-strength used to treat "moderate to severe acute pain," "for the management of chronic severe

---

[6] "In reaching his credibility determination, The ALJ found that although Kearse suffered from impairments that could cause some of the alleged symptoms, the objective medical evidence did not support the alleged severity. An extensive analysis of the objective medical evidence revealed that Kearse did not begin to complain of headaches until after filing his disability applications. Furthermore, there is no objective evidence in the record to support such complaints. Moreover, although Kearse testified that he had to be hospitalized approximately twice a year for such headaches, there is no such supporting documentation contained in the record. Kearse noted several times that he either took no prescription medication, or only samples that he received from the hospital. Instead, the record reveals that he took only Tylenol and Motrin for pain. See Shively, 739 F.2d at 989–90 (upholding the ALJ's finding that claimant's pain was not as severe as he alleged based partly on the prescribed medications of record)."

[7] Zohydro ER (hydrocodone bitartrate) – Drug Summary. Retrieved June 5, 2017 from Physicians' Desk Reference Online (PDR.net): http://www.pdr.net/drug-summary/Zohydro-ER-hydrocodone-bitartrate-3389.4565

[8] Physicians' Desk Reference 604 (PDR; 69th ed. 2015). See also Acetominophen/Oxycodone – Drug Summary. Retrieved June 5, 2017 from Physician's Desk Reference Online (PDR.net): http://www.pdr.net/drug-summary/Percocet-acetaminophen-oxycodone-2483.1051.

pain [] in patients who require daily, around-the-clock, long-term opioid treatment."[9] While it is true that Plaintiff did stop taking Hydrocodone and Oxycodone, the record evidences that this was not due to lack of necessity or lack of pain, but rather because she did not tolerate those medications well. (R. 769) (Plaintiff "has allergies or intolerances to hydrocodone, oxycodone with migraines," and "she has also failed tramadol"). Plaintiff has continued taking Nucynta throughout the record. As such, the medications she takes supports her subjective complaints of pain.

Although ALJ Kostol concludes by saying that "nonetheless, the claimant's pain symptoms stemming from both her fibromyalgia unspecified arthritis, and idiopathic small fiber sensory neuropathy have been taken into account when determining [Plaintiff's RFC]," remand is nonetheless warranted. The RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015). A discussion of the functional limitations in broad terms followed by an in-depth analysis supporting the ALJ's function findings will satisfy the regulations requirement as well. See Ashby v. Colvin, 2015 WL 1481625, at *2 (S.D.W. Va. Mar. 31, 2015)

Under these circumstances, it is clear that ALJ Kostol either did not fully comprehend or failed to address significant evidence in the record. She further explicitly begins her RFC explanation by confirming that "in making [her] finding, [ALJ Kostol] considered all symptoms and the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [and] also [] opinion evidence." (R. 23). Because ALJ Kostol's credibility analysis does not have substantial support, and her assessment

---

[9] Nucynta (Tapentadol) – Drug Summary. Retrieved June 5, 2017 from Physician's Desk Reference Online (PDR. Net): http://www.pdr.net/drug-summary/Nucynta-tapentadol-272.

of the opinion evidence is likewise flawed, an RFC based on these can hardly be substantiated.

Mascio v. Colvin, 780 F.3d 632, 636-37 (4th Cir. 2015) ("The missing analysis is especially troubling because the record contains conflicting evidence as to [the plaintiff's] residual functional capacity – evidence that the ALJ did not address"). As such, there can be no confidence that ALJ Kostol has "considered the important evidence" in arriving at her RFC when she has either misinterpreted, or missed entirely, a number of significant issues evidenced in this record. Nor, under these circumstances, can ALJ Kostol's credibility analysis have substantial evidentiary support. As a result, each subsequent component of her analysis is impermissibly flawed.

### 2. Treating Physician

The regulations, specifically 20 C.F.R. § 404.1527(c), discuss how the ALJ weighs treating source medical opinions:

> *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not

give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination*. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship*. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization*. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors*. When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

Although it is not binding on the Commissioner, a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Such opinions should be accorded great weight because they "reflect[] an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir. 1983). In Craig v. Chater, however, the Fourth Circuit further elaborated on this rule:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

76 F.3d 585, 590 (4th Cir. 1996). In addition, "[n]either the opinion of a treating physician nor the determination of another governmental entity are binding on the Secretary." DeLoatch v.

Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983). Thus, "[t]he treating physician rule is not absolute." See Hines v. Barnhart, 453 F.3d 559, 563 n.2 (4th Cir. 2006).

Case law instructs as to what types of situations a treating physician's representations has been given little weight. A treating physician's assessment may warrant less than controlling weight when his treatment was infrequent, and his opinion was unsupported by his own treatment notes or other information in the file. Russell v. Comm'r of Soc. Sec., 440 Fed.Appx. 163 (4th Cir. 2011) (Rheumatologist not seen claimant for six months when he wrote his opinion, and he opined that claimant's limited use of her hands precluded work, despite having noted at her prior visit that she had full range of motion in her hands). A treating physician also loses credibility when her testimony is directly contradicted by her own treatment notes. Burch v Apfel, 9 Fed. Appx. 255 (2001) (Treating physician given little credibility when she testified that 1) Claimant was admitted to the hospital for suicidal thoughts, when her notes clearly indicated Claimant's condition was stable and she was not considered harmful to herself or others; 2) Claimant's poor response to medication was not her fault, when treatment notes clearly indicated otherwise – "as usual she had not given the medication adequate time to reach some degree of remission;" 3) Claimant's alcohol consumption did not contribute to her failure to recover, when notes indicated Claimant continued to drink against physician's advice and that it was "not beneficial;" and numerous other contradictions and inconsistencies discussed at length by the ALJ).

Here, in contrast, ALJ Kostol apparently afforded no weight because of the relatively short length of the treatment relationship, and the yes/no format of the opinion:

> This source's responses to the representative's list of questions are given no weight for several reasons. First, at the time Dr. Long made the opinion he indicated that he bad only seen the claimant on two occasions over a period of four months prior to rendering the opinion. Second, the opinion is mainly in the form of a "yes" or "no" format that gives no detailed explanation as to why the doctor chose the answer "yes" to the limitations tailored by the

claimant's representative (who simply listed the claimant's subjective complaints in each question). Third, the opinion is inconsistent with the evidence from Dr. Long's own initial examination wherein the physical examination itself revealed that the claimant was alert, in no acute distress, her vision was normal, her cranial nerves were intact, her lungs were clear, and the examinations of her heart, abdomen, musculoskeletal system, and neurological system were normal (Exhibit 28F).

Fourth, the claimant received the majority of her treatment for the diagnoses from specialists whose notes do not corroborate the limitations. In particular, the claimant's neurologist documented in November 2012 that the claimant's numbness/tingling/generalized pain/joint pain/headaches were better on IVIG treatments and she reported in March 2014 that she was only getting severe headaches one to two times per month. Further, Dr. Brizuela indicated in June 2014 that the claimant's neuropathy was stable with IVIG, the claimant's cardiovascular specialist indicated in August 2014 that the claimant's tachycardia had resolved (Exhibit 35F p. 3), and the claimant's orthopaedist indicated that despite the claimant's positive tender points she did not see fibromyalgia as being present (Exhibit 36F p. 2). Thus, since Dr. Long's limitations are questionable and not supported by the evidence as a whole the undersigned gives his responses, in their entirety, no weight.

(R. 28). Plaintiff argues that there is no set number of visits that would warrant discounting a treating physician's opinion in the regulations, and that there is likewise no requirement of specific format articulated or required. (ECF No. 12 at 12). However, the Commissioner is correct that the regulations do permit consideration of the length and extent of the treatment relationship, relevant to the first point, under 20 CFR § 416.927(c)(2). Nonetheless, Fourth Circuit precedent with which the undersigned is familiar suggests that the facts here would not rise to that level. Dr, Long, who began a treating physician relationship with Plaintiff months prior and had just seen Plaintiff two weeks prior to writing his opinion, is clearly distinct from the treating rheumatologist in Russell, and is entirely dissimilar from Burch. As such, the ALJ's first reason for discounting Dr. Long's opinion is questionable at best, and the Commissioner cites no case to the contrary.

As to the second reason, the Commissioner is correct that the ALJ may properly consider the extent to which opinions are explained with supporting evidence, 20 C.F.R. § 416.927(c)(3), as to the format of Dr. Long's opinion which simply stated "yes/no" without specific explanation. Here, Dr. Long's opinion indeed provides very little supporting explanation.

As to the third and fourth reasons, the Commissioner correctly observes that 20 C.F.R. §
416.927(c)(4) permits consistency of an opinion with the record as a whole to inform a
determination of weight, and that 20 C.F.R. § 416.927(c)(5) permits more weight to be afforded
to specialists than non-specialists. However, in justifying ALJ Kostol's rationale as to these two
factors, the Commissioner makes the same faulty assumptions as did the ALJ. As elaborated
previously, there is no discernible nexus between the evidence the ALJ and the Commissioner
cite and Plaintiff's complaints. The undersigned cannot guess how the facts that "the claimant
was alert, in no acute distress, her vision was normal, her cranial nerves were intact, her lungs
were clear, and the examinations of her heart, abdomen, musculoskeletal system, and
neurological system were normal (Exhibit 28F)" in any way detract from Dr. Long's opinion, nor
does the ALJ explain how these findings are relevant to her consideration of same, other than the
conclusory statement that they are "inconsistent" with no logical bridge to connect the two. The
same is true of tachycardia, whether resolved or not. Further, ALJ Kostol also again cites her
complete misunderstanding of Dr. Watkin's notes.

When considered in total, the majority – at least three quarters - of the ALJ's rationale for
assigning no weight to Dr. Long rests on a flawed foundation, and thus does not have substantial
evidentiary support. As such, the redetermination of weight of medical opinions must be
undertaken once the underlying errors are first corrected.

## VII.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the
Plaintiff's application for Supplemental Security Income is not supported by substantial
evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF
No. 11 be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **DENIED**,

the decision of the Commissioner be vacated, and this case be **REMANDED** to the Commissioner for further proceedings consistent with this report and recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this June 6, 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE